**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **HOWARD PIKE, M.D.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action No.** |
| **v.** | : | |
| | : | _____ |
| **THE SOUTHEAST PERMANENTE** | : | **JURY TRIAL DEMANDED** |
| **MEDICAL GROUP, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## COMPLAINT

Plaintiff Howard Pike, M.D. ("Dr. Pike" or "Plaintiff"), by and through his undersigned counsel, respectfully files this Complaint under the Americans with Disabilities Act (ADA), 42 USC § 12101 *et. seq.*, action against The Southeast Permanente Medical Group ("Permanente") based on its discriminatory and retaliatory termination of Dr. Pike and its failure to accommodate his disability following repeated requests for accommodations.

## JURISDICTION AND VENUE

1.

Dr. Pike is and has been at all times relevant to this matter a citizen and resident of Fulton County, Georgia.  Dr. Pike was an "employee" of Permanente

within the meaning of 432 USC § 12111 (4) and a "qualified individual" within the meaning of 42 USC §12111 (8).

2.

Defendant The Southeast Permanente Medical Group, Inc. is a Georgia domestic Professional Corporation with its principal office address at 3495 Piedmont Road, 9 Piedmont Center, Atlanta, Georgia 30305.   Its Registered Agent is Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Gwinnett County, Georgia 30092.  Permanente is a covered entity within the meaning of the 42 USC § 12111 (2).

3.

The jurisdiction of this Court is invoked pursuant to its federal question jurisdiction provisions contained in 28 U.S.C. § 1331 and the jurisdictional provisions set forth in 42 USC § 2000e-5, which are incorporated by reference into the ADA at 42 USC § 12117 (a).

4.

Venue is proper in this action because the unlawful employment practices occurred in this District and Division.

5.

On February 25, 2022, Dr. Pike filed his charge of disability discrimination, failure to accommodate and retaliation with the Equal Employment Opportunity Commission alleging that his then employer, Permanente, discriminated and retaliated against him by, among other things, by failing to reasonably accommodate his requests to work a modified work schedule due to a cardiac-related physical impairment and disability.

6.

On June 17, 2022, the District Director of the Equal Employment Opportunity Commission in Atlanta, Georgia issued to Plaintiff the Notice of Suit Rights which provided that a lawsuit could be filed against Defendant within ninety (90) days of its issuance.  This lawsuit is being filed on a timely basis.

## FACTUAL BACKGROUND

A. **Dr. Pike's Disability and His Outstanding Performance at Permanente**

7.

Dr. Pike has a physical impairment which constitutes a disability under the Americans with Disabilities Act:  he is impaired with a heart condition which prevents him from being able to  safely perform the surgical component in his chosen life profession, that of being an orthopaedic surgeon.  Even with the heart condition

and with a reasonable accommodation, he was still able to work as an orthopedic doctor.  Prior to his constructive termination in December 2021, Dr. Pike had been employed by Permanente in the Atlanta area for over five (5) years as an orthopaedic surgeon, having risen to Chief of the Podiatry Department as of 2017.

8.

Dr. Pike has a history and a record of a physical impairment that substantially limits one or more major life activities.  The major life function limited by Dr. Pike's impairment includes, among other things,  working as an active surgeon.

9.

Before Dr. Pike was diagnosed with his heart condition in June 2020, he was recognized as a rising star in the Permanente organization.

10.

Permanente has created a Medicine in Management Program.  Each year, a small group of department managers are chosen to enter this exclusive and highly selective year long training program.  This program is for physicians who are recognized as having potential to increase the efficacy of their Departments' care delivery and to be groomed for higher levels of management at Permanente.  In 2018, Dr. Pike was recruited into this program, graduated, and was recognized as having performed very well.

11.

After graduating from the Medicine in Management Program, each time Dr. Pike met with his supervisor for a formal review, he was told to "get ready to go to the Harvard Business Management Course and the Kaiser National Middle Management Course." At the time of his heart illness diagnosis, entrance into these programs had not yet come to fruition.

12.

Dr. Pike was also evaluated to have a perfect score of "Z" in every category in an analytical and interpersonal skill set assessment administered by Permanente as part of the Medicine in Management program. He consistently received excellent ratings on patient satisfaction surveys, ratings which were above company standards.

13.

As Chief of the Podiatry Department, Dr. Pike increased physician engagement and satisfaction, taking survey responses from the bottom quartile to the top 10% in the organization in his first year as Chief. Dr. Pike maintained that engagement and satisfaction throughout his tenure. While Chief of the Podiatry Department, he raised the Department's average patient satisfaction survey "top box" scores to 88%. He was considered an exemplary physician, leader, and

employee, until his heart condition worsened in early 2020 and he was subsequently instructed to cease doing surgery  in June 2020.

14.

At all times relevant to this action, Dr. Pike was a qualified individual within the meaning of the ADA.

### B. June 2020 Reduction in Work Hours

15.

In June 2020, following his contracting Covid, Dr. Pike developed worsening heart arrythmias . Even with his arrythmia condition, Dr. Pike was still able to work as a non-surgical orthopedic doctor.

16.

On or about June 30, 2020, because of Dr. Pike's heart condition, Dr. Pike was told by the Permanente administration that he would not be allowed to continue his work as an orthopaedic surgeon. Specifically, he was instructed to cancel all scheduled surgery, schedule no future surgery, and cease participating in hospital and medical group on-call duties.

17.

On June 30, 2020, Dr. Pike was advised by a leadership committee at

Permanente in Atlanta that he must immediately cease all surgical activities.  Dr. Pike had requested in his application for renewal of hospital privileges to have a back-up surgeon present during surgery to accommodate his medical condition. Without discussion, or the interactive process, the Permanente committee reviewed this request for an accommodation and ordered Dr. Pike to stop doing all surgical activities, as noted above.

18.

Dr. Pike had for several years been assigned by Permanente the responsibility of helping to train fellowship-level surgeons, and consequently the fellowship surgeons were nearly always in the operating room with Dr. Pike for that training.  Accommodating Dr. Pike's request for the above-described backup surgeon would have constituted a reasonable accommodation and would not have resulted in an undue hardship to Permanente.

19.

Further, despite Dr. Pike's request for an accommodation due to his disability, Permanente failed to replace the surgical work which Dr. Pike had formerly performed with non-surgical general orthopaedic office practice.  Doing so would have constituted a reasonable accommodation and not have resulted in an undue hardship for Permanente.

20.

As a result, his hours of work were reduced twenty (20) percent, or by one (1) day a week, and his compensation was correspondingly reduced by twenty (20) percent.

### C.  May 2021 Further Reduction in Work Hours

21.

In August 2020, Dr. Pike made the request to Permanente leadership in Atlanta that he be granted a reasonable accommodation under the ADA and be allowed to perform a general orthopaedic office practice.   Without discussion and without Permanente engaging in the interactive process, Dr. Pike's  request for an accommodation was  denied.

22.

Also in August 2020, Dr. Pike was told by Permanente leadership that he had to step down from his position as Department Chief as he was no longer a surgeon and as such, could not be allowed to continue to lead a Surgical Department.  He was allowed to continue to lead the Department and hold the Department Chief position for the next nine months, until May 2021, but only on an interim basis.

23.

Upon stepping down from his Chief position in May 2021, as he had been directed to do, his working hours were further reduced by one (1) more day, purportedly because he was no longer Chief of Podiatry.  From August 2020 through May 2021, however, there was a shortage of orthopaedic providers providing office-based work, and there was no legitimate business or medical reason for Permanente to continue to not assign office-based orthopaedic work to Dr. Pike.  Assigning office-based orthopaedic work to Dr. Pike would have constituted a reasonable accommodation and would not have resulted in an undue hardship.

D.   **Permanente's Refusal to Accommodate Non-Face-to-Face Work in August 2021**

24.

Dr. Pike's heart-related disability made him particularly susceptible to becoming seriously ill if he contacted Covid, a clear and present danger to front line health care professionals.  His Mayo Clinic Cardiology treating physician's note of August 30, 2021, forwarded to Permanente leadership, stated:

To Whom it may Concern:

> Dr. Richard Pike I last saw in November 2020 for cardiac ventricular ectopy.  He had had a case of COVID-19 during the early phases of the Pandemic.  He has been working doing NF2F [non-face-to-face] consultation in more recent

times.  He and I both have concerns about him returning to F2F encounters at this time:
1.   Progressive waxing and waning of vaccination efficacy.
2.   Increased infectivity of Delta variant and preponderance of Delta in the community.
3.   Low vaccination rates in the local population in GA.
4.   Poor adherence of masking protocols locally.

Given these factors continued NF2F clinical activities would appear to be a very reasonable accommodation for the next 4-6 months.

25.

In August 2021, Permanente rejected Dr. Pike's request for the accommodation to temporarily work exclusively non-face-to-face (NF2F).  At the time of this refusal, Dr. Pike was working 1-2 days (8-16 hours) a week of NF2F work as well as some F2F work, comprising a total of 3 days a week of work.  He was told that there was insufficient NF2F work available for him to work exclusively NF2F for three days each week.

26.

The statement by Permanente that there was insufficient NF2F work available to Dr. Pike was not true, but nonetheless was used to deny Dr. Pike an accommodation.  Rather, he was given an ultimatum:   work a three day (24 hour) week F2F schedule or a half-day (four hour) week NF2F.  He was also told that if he accepted the half-day (four hour) week  NF2F schedule, that this new placement

and assignment would be permanent.  In other words, regardless of any future change in circumstances and the possible need for more NF2F work for which Dr. Pike was eminently qualified, Dr. Pike was told that he would still be stuck with working four hours weekly for the remainder of his employment with Permanente.

27.

Dr. Pike knew that Permanente's stated reason, that there was insufficient NF2F work, was untrue since as a former Department Chief, Dr. Pike was provided Permanente data that showed that there was substantial NF2F work available in August 2021 and beyond, and that other physicians in the Podiatry Department were performing substantial NF2F work during that same time.

28.

Before the pandemic, NF2F work was an insubstantial and unmandated part of podiatry and orthopaedic physicians' work at Permanente. The pandemic amplified the need for NF2F work.  Ultimately, Dr. Pike was assigned to work only four hours a week of NF2F work, a change that resulted in loss of an additional twenty hours (two  and a half days) of work and pay, of all employee benefits and was told that the reason was due to insufficient patient demand for this type of service.

### E.  Availability of NF2F Work

29.

Permanente improperly and illegally refused in August 2021 to provide Dr. Pike with the reasonable accommodation that he be allowed to temporarily work remotely for three days a week.  Even if that accommodation resulted in other podiatry physicians or orthopaedic doctors performing more face-to-face than remote work, the NF2F work was not an essential job function, as evidenced by the fact that these physicians, including Dr. Pike, performed the great majority of their work F2F prior to the pandemic.  Granting this request for a reasonable accommodation would not have resulted in an undue hardship to Permanente.

30.

The imperative of requesting and being provided a reasonable accommodation based on an employee's  underlying certain medical condition is addressed in The EEOC's Technical Assistance Guidance, updated as of March 14, 2022, *What You Should Know About Covid-19 and the ADA, Rehabilitation Act and other EEO laws*, provides as follows:

> **G.3. What does an employee need to do in order to request reasonable accommodation from an employer because the employee has one of the <u>medical conditions</u> that CDC says may put a person at higher risk for severe illness from COVID-19?** *(5/5/20)*

An employee—or a third party, such as an employee's doctor—must <u>let the employer know</u> that the employee needs a change for a reason related to a medical condition (here, the underlying condition).  Individuals may request accommodation in conversation or in writing.  While the employee (or third party) does not need to use the term "reasonable accommodation" or reference the ADA, the *employee may do so.*

The employee or the employee's representative should communicate that the employee has a medical condition that necessitates a change to meet a medical need.  After receiving a request, the employer may <u>ask questions or seek medical documentation</u> to help decide if the individual has a disability and if there is a reasonable accommodation, barring <u>undue hardship</u>, that can be provided. For additional information on reasonable accommodation, see <u>Section D</u>.

31.

The CDC has also addressed this issue in its publication "Underlying Medical Conditions Associated with Higher Risk for Severe COVID-19: Information for Healthcare Professionals."   That publication states among other things the following:

Summary of Conditions with Evidence

1.   **Higher risk** for severe COVID-19 outcomes is defined as an underlying medical condition or risk factor that has a published meta-analysis or systematic review or complete the <u>CDC systematic review process</u>. The meta-analysis or systematic review demonstrates good or strong evidence, (depending on the quality of the studies in the review or meta-analysis) for an increase in risk for at least one severe COVID-19 outcome……..

Heart conditions (such as heart failure, coronary artery disease, or cardiomyopathies).

32.

The following is the link to this publication:

https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-care/underlyingconditions.html

### E.   **Retaliation by Permanente**

33.

Dr. Pike was retaliated against when he was informed that if he accepted the four hours weekly of work starting in early October 2021, that the four hours weekly position would be permanent and that he would not be eligible for consideration for other positions or increased hours.

34.

Dr. Pike resigned (constructively terminated)  from his four hours of work weekly position, a position that resulted in loss of all employee benefits, in December 2021 because he was relegated to a position, which was clearly a violation of the reasonable accommodation and retaliation provisions of the ADA, and it was fundamentally unfair and created intolerable working conditions to be expected to work no more than four hours a week and be provided  no employee benefits.

## GENERAL ALLEGATIONS

## COUNT I
### (DISCRIMINATION UNDER THE ADA)

35.

Paragraphs 1 through 34 above are expressly incorporated by reference.

36.

Permanente discriminated against Dr. Pike on account of his physical impairment and disability, a heart condition, an impairment which Permanente wrongfully considered  as preventing him from engaging in the essential functions of the  major life function of working. As a result, he was treated worse than otherwise similarly situated individuals, treatment that resulted in the reduction of his work hours and constructive termination.

37.

Permanente discriminated against Dr. Pike when he requested that he be able to maintain his full-time hours of an orthopaedic office practice after he was told in June 2020 to stop conducting  surgery.  The orthopedic office positions were open and available, the work needed to be done and the only reason Dr. Pike was not given that  opportunity  was  because  of  Permanente's  discrimination  against  Dr. Pike because of his physical impairment.

38.

Permanente discriminated against Dr. Pike when he was instructed to step down as Chief of the Podiatry Department, beginning in August 2020, eventually stepping down in May 2021, and his hours of work were reduced by one additional day, from four days to three days a week.    This mandate for Dr. Pike to step down as Chief as he was no longer doing surgery was arbitrary, not a part of Permanente's written by-laws or past practice and constituted discrimination, a failure to reasonably accommodate and retaliation under the ADA.

39.

Permanente further  discriminated against Dr. Pike when in October 2021 he was relegated to work only four hours a week, NF2F, unless he was willing to work face-to-face with patients three days a week.  Such face-to-face work would have placed Dr. Pike in substantial risk of re-contracting Covid.  He was further informed that if he accepted the four hours a week non-face-to-face work, he would not be able to transfer out of the four hours a week assignment and that the assignment was permanent.

40.

As a result  of the disability discrimination by Permanente, Dr. Pike requests that he be awarded back pay, front pay, compensatory and punitive damages, all

available equitable relief and his costs and attorney's fees associated with this proceeding because of the discrimination by Permanente.

## COUNT II
## (FAILURE TO REASONABLY ACCOMMODATE AS REQUIRED BY THE ADA)

41.

Paragraphs 1 through 40 above are expressly incorporated by reference.

42.

Permanente failed to reasonably accommodate Dr. Pike's requests in June 2020, May 2021 and August 2021 that he be allowed to perform more non-face-to-face work than assigned. Being able to work more hours non-face-to-face would have resulted in more hours being assigned to him and higher compensation.

43.

His work hours were reduced by an additional day in August 2020 because of his inability to continue to operate, but no accommodation was provided to Dr. Pike., despite his request for an accommodation, which would allow him to perform non-operative orthopaedic work. Dr. Pike was told by his superior, Dr. Lucarini, that "the only work you will be doing is the work we give you in the Podiatry Department." Such an accommodation would have been reasonable, would not have

adversely affected patient treatment and would not have constituted an undue hardship.

44.

Allowing such non-operative orthopaedic work would allow Dr. Pike to work more than the three days a week that were assigned to him in May 2021.

45.

Permanente's failure to accommodate Dr. Pike to allow him to work general orthopaedic office work in August 2020 and in May 2021 constituted failures to accommodate, accommodations which would not have resulted in an undue hardship for Permanente. Permanente's failure to accommodate Dr. Pike on two separate occasions resulted in his employment being reduced from five (5) days a week to three (3) days a week:   in June 2020, when he was instructed to cease all surgical activities and  in May 2021, when he stepped down as Chief,  as he had previously been instructed to do.

46.

Permanente repeatedly failed to engage in the interactive process regarding how an accommodation would have allowed Dr. Pike to continue working at Permanente, without Permanente encountering an undue hardship.

47.

Further, Permanente's refusal beginning in August 2021 to allow Dr. Pike to work three days a week, or hours additional to the four hours a week, performing non-face-to-face medical examinations, constituted a third failure to accommodate, an accommodation that would not have resulted in an undue hardship.

48.

As a result of the failure to accommodate by Permanente, Dr. Pike requests that he be awarded back pay, front pay, compensatory and punitive damages, all available equitable relief and his costs and attorney's fees associated with this proceeding because of the failure to accommodate by Permanente.

**COUNT III**
**(RETALIATION PROHIBITED BY THE ADA)**

49.

Paragraphs 1 through 48 above are expressly incorporated by reference.

50.

Dr. Pike's requests for a reasonable accommodation regarding his work assignments and work hours constituted protected activity under the ADA and the

denial of those requests by Permanente were baseless, mean-spirited, illegal and retaliatory.

51.

Dr. Pike's request that Permanente maintain his full schedule and hours of work in June 2020, May 2021 and October 2021 was met with disdain, was ignored, denied and resulted in the decrease in his work days from five to four (June 2020), four to three (May 2021) and three to one half day (October 2021). This reduction in hours by Permanente was illegal and retaliatory under the ADA.

52.

Permanente's retaliation against Dr. Pike which resulted in his reduced working hours also resulted in reduced or eliminated employee benefits, the loss to Permanente of a highly talented physician who could have seen many more patients than assigned, and in a substantial loss of income to Dr. Pike, all of which led to his constructive termination due to intolerable working conditions in December 2021.

53.

As a result of the retaliation by Permanente, Dr. Pike requests that he be awarded back pay, front pay, compensatory and punitive damages, all available equitable relief and his costs and attorney's fees associated with this proceeding.

## COUNT IV
## ("REGARDED AS" DISCRIMINATION PROHIBITED BY THE ADA)

54.

Paragraphs 1 through 53 above are expressly incorporated by reference.

55.

Alternatively, if Dr. Pike was not disabled within the meaning of the ADA, Permanente nonetheless regarded Dr. Pike as disabled and because of how it regarded him, it discriminated and retaliated against him by removing him from positions of authority, refusing to allow him to work non-face-to-face with patients and reducing his hours of work on three occasions between June 2020 and December 2021, a reduction from a full five days a week to one half a day a week.

56.

As relief, Dr. Pike requests back pay, front pay, compensatory and punitive damages and costs and attorney's fees incurred in the bringing of this action.

## PRAYER FOR RELIEF

WHEREFORE, based on the foregoing, Plaintiff Dr. Howard Pike prays for the following relief in this matter:

(a)     That Dr. Pike be awarded all relief available under the ADA, including back pay, reinstatement or alternatively front pay,

compensatory and punitive damages, equitable relief, costs of this matter and attorneys' fees.

(b )   That Dr. Pike be granted a trial by jury as to all issues.

(c)    That Dr. Pike be granted injunctive and declaratory relief as appropriate; and

(d)    That the Court grant Dr. Pike any and all other relief to which he may be entitled.

This 8th day of August  2022.

Respectfully submitted,

By: */s/ Gary R. Kessler*
    Gary R. Kessler
    Gary R. Kessler P.C.
    Georgia Bar No. 416562
    2573 Apple Valley Road NE
    Atlanta, Georgia 30319
    404-909-8200 (office)
    gkessler@martensonlaw.com

    ATTORNEY FOR PLAINTIFF
    HOWARD PIKE, M.D.